UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

**FIDELITY AND DEPOSIT COMPANY**
**OF MARYLAND,**

      **Plaintiff,**

v.                                                                                  Case No. 2:19-cv-567

**RAMSGATE CORPORATION, INC.**
**S. GREY FOLKES**
**and**
**ROBERT KINSER,**

      **Defendants.**

## MEMORANDUM OPINION AND ORDER

In this indemnity claim, Plaintiff Fidelity and Deposit Company of Maryland ("F&D" or "Plaintiff"), filed suit to recover sums it paid to the City of Suffolk ("City") to settle the City's claims made against F&D's principal, Defendant Ramsgate Corporation ("Ramsgate"). The suit also names individual indemnitors S. Grey Folkes and Robert Kinser (collectively "Defendants"). F&D alleges the Defendants owe the cost of settling the claims, which arose against subdivision bonds that Plaintiff had posted for Defendants with the City. The parties previously entered their consent to proceed before a United States Magistrate Judge and all further proceedings in the case were referred in accordance with 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure. The matter is now before the Court on cross-motions for summary judgment. Pl.'s Mot. Partial Summ. J. (ECF No. 19); Defs.' Cross Mot. Partial Summ. J. (ECF No. 24). Because the undisputed facts reveal no evidence of bad faith by F&D in settling the City's claims, the Court GRANTS Plaintiff's Motion for Partial Summary Judgment and will enter summary judgment in

1

Plaintiff's favor on Plaintiff's claim in the Complaint. Accordingly, the Court DENIES Defendants' Cross Motion for Partial Summary Judgment.

## I. SUMMARY OF UNDISPUTED MATERIAL FACTS

On August 15, 2001, Ramsgate entered into an Agreement of Indemnity ("Agreement") with F&D to obtain subdivision bonds. Agreement of Indemnity (ECF No. 20-4, at 4-8) ("Agreement"); see Pl.'s Mem. Supp. Partial Summ. J. ¶ 10 (ECF No. 20, at 3) ("Pl.'s Mem."). Defendants Kinser and Folkes also executed the Agreement as indemnitors. Agreement (ECF No. 20-4, at 7); see Pl.'s Mem. ¶ 11 (ECF No. 20, at 3). Under the terms of this Agreement, Fidelity would execute or procure bonds on behalf of Ramsgate, to guarantee Ramsgate's performance of the subdivision work and payments to its subcontractors. Agreement (ECF No. 20-4, at 4); see Pl.'s Mem. ¶ 13 (ECF No. 20, at 3). In turn, Defendants promised to indemnify F&D against any liability for losses and expenses related to the bonds. Agreement (ECF No. 20-4, at 4); see Pl.'s Mem. ¶ 14 (ECF No. 20, at 4). Under the indemnification provisions, Defendants agreed that F&D had the right to settle claims brought against the bonds unless Defendants requested to litigate a claim, defend a suit, or appeal a judgment *and* deposited collateral with F&D. Agreement (ECF No. 20-4, at 6); see Pl.'s Mem. ¶ 15 (ECF No. 20, at 4).

In 2002, Ramsgate undertook work on the first subdivision called Hillpoint Section 1 in the City of Suffolk. Pl.'s Mem. ¶ 16 (ECF No. 20, at 4). For this project, F&D posted a subdivision bond in the amount of $688,081.78 with the City. Id. ¶¶ 17, 19; see also Subdivision Improvement Bond 08652403 (ECF No. 20-4, at 9). This bond was later reduced to $229,948.12 after the construction of the subdivision was mostly completed. Pl.'s Mem. ¶ 20 (ECF No. 20, at 4). In 2003, F&D also posted a bond with the City in the amount of $196,231.29 for the construction of a second development referred to as Hillpoint Section 2. Id. ¶¶ 22-23, 25 (ECF No. 20, at 5); see

2

also Subdivision Improvement Bond 08697759 (ECF No. 20-4, at 11). Construction on these projects was provided by Preston Fussell, another indemnitor, and his business Precon Construction, Inc. Pl.'s Mem. ¶ 5 (ECF No. 20, at 3).[1] Engineering and survey work were done by Defendant Folkes's engineering firm Hassell & Folkes. Id. ¶ 6.

Defendants allege that they completed construction of the subdivisions in 2002 and 2003. Defs.' Mem. Supp. Defs.' Cross Mot. Partial Summ. J. ¶ 5 (ECF No. 25, at 2) ("Defs.' Mem."); see also Pl.'s Mem. ¶ 37 (ECF No. 20, at 6). And beginning in 2004 certificates of occupancy were issued for Hillpoint houses. Aff. Robert R. Kinser ¶ 5 (ECF No. 25-4, at 1). But the fact of completion is sharply contested. On March 7, 2008, the City sent a document entitled "*Informal Punch List* at Hillpoint Greens" ("Punch List") to David Lane, the Construction Superintendent, and James Sisson,[2] Vice President of Precon Construction, listing fifty-four items on the Hillpoint developments that the memorandum asserted required repair. *Informal Punch List* at Hillpoint Greens (ECF No. 20-4, at 40-43); see also Pl.'s Mem. ¶ 38 (ECF No. 20, at 6). Shortly afterwards, on April 16, 2008, Sisson emailed Vandell Taylor, of the City's Public Works Department, acknowledging that there was still Punch List work to be completed. Email re Informal Punch List at Hillpoint Greens (ECF No. 20-4, at 44); see also Pl.'s Mem. ¶ 40 (ECF No. 20, at 6-7). It is undisputed that this work was never performed. Defs.' Mem. ¶ 8 (ECF No. 25, at 3).

This email also raised the issue of as-built drawings. When, or if, these as-builts were provided to the City is also disputed by the parties. Defendants acknowledge that Hassell & Folkes

---

[1] Preston Fussell, the third individual indemnitor who signed the Agreement, is now deceased. Pl.'s Mem. ¶ 4 (ECF No. 20, at 2).
[2] The Memorandum from the City of Suffolk entitled "*Informal Punch List* at Hillpoint Greens" lists one of the recipients as "Jimmy Session" rather than James (or Jimmy) Sisson. See *Informal Punch List* at Hillpoint Greens (ECF No. 20-4, at 40).

3

was required to submit as-builts to the City, and in an interrogatory response state that the as-builts were provided to the City in 2002 and 2003. Pl.'s Mem. ¶¶ 47-49 (ECF No. 20, at 7-8). However, Sisson's 2008 email advised that Hassell & Folkes had not yet sent the as-builts to the City and that they "would submit [them] to [the City] asap." Email re Informal Punch List at Hillpoint Greens (ECF No. 20-4, at 44); see Pl.'s Mem. ¶ 50 (ECF No. 20, at 8). Further, when F&D communicated with Hassell & Folkes in June 2018, Leigh Ann Folkes, sister of Defendant Folkes and President of Hassell & Folkes, stated that the company could not locate any files relating to Hillpoint Section 1. Defs.' Resp. Pl.'s First Interrogs. ¶ 36 (ECF No. 20-3, at 11); Pl.'s Mem. ¶¶ 51-52 (ECF No. 20, at 8). Thus, whether the as-built drawings were ever transmitted to the City remains unclear, but at least in 2008 Ramsgate's engineering firm indicated it "would submit [them]." Email re Informal Punch List at Hillpoint Greens (ECF No. 20-4, at 44); see Pl.'s Mem. ¶ 50 (ECF No. 20, at 8).

In 2014, the City continued to discuss remaining work to be completed at the Hillpoint developments with Brad Fussell, son of Preston Fussell. See Email re Hillpoint Meadows – Ramsgate Corp. (ECF No. 20-6, at 3, 5) (discussing the need to complete the punch list work so that the subdivisions could be "accepted into the City's maintenance system to relieve [Ramsgate] of ongoing maintenance responsibilities"); Dep. Jason Trimyer 20:25-21:9 (ECF 20-5, at 6) (asking Mr. Trimyer, a construction manager for the City, whether he was involved in trying to get punch list work completed in 2014, to which Mr. Trimyer stated "I do remember having some conversations, more than one, with Mr. Fussell, Brad Fussell, I believe."). An email from Brad Fussell to Brian Alperin, the Principal Planner for the City, dated May 28, 2014, stated that Brad Fussell "met with project owners last week regarding the punch list and developed a game plan to finance the work." Email re Hillpoint Meadows – Ramsgate Corp. (ECF No. 20-6, at 2). And on

October 1, 2014, Brad Fussell noted in an internal email that the work to complete the punch list for the two developments was "160-175k with a relative unknown for storm drain cleaning/TVing" and that "[b]ecause some of these lines are years old, they will probably require repairs due to normal wear and tear." Id. Finally, it is undisputed that the Defendants never obtained a release from the City on the bonds despite their present claims that the work on both subdivisions had been "completed" in the early 2000s. See Pl.'s Mem. ¶¶ 21, 26 (ECF No. 20, at 5).

On October 4, 2017, the City of Suffolk sent F&D a claim against the bonds, seeking the full amount of both bonds for a total of $426,179.41. Pl.'s Mem. ¶¶ 27-31 (ECF No. 20, at 5). The City's claim included a report from the engineering firm of Clark Nexsen, which estimated the cost of repairs for the two sections of the subdivision at $779,531. Hillpoint Greens Infrastructure Inspection Report (ECF No. 20-4, at 22) ("Report"); see Pl.'s Mem. ¶¶ 32-34 (ECF No. 20, at 6). This report did not conclude which items were not constructed in accordance with the requirements of the City and state of Virginia and which were "normal wear and tear." Defs.' Mem. ¶ 11 (ECF No. 25, at 3); see Report (ECF No. 20-4, at 18-39). In response F&D hired a consultant, Darrell Hall at J.S. Held, LLC to investigate the validity of the claim. Pl.'s Mem. ¶ 35 (ECF No. 20, at 6). Mr. Hall determined that most of the City's claims involved "normal wear & tear or normal maintenance work," which Mr. Hall argued to the City. Email re Ramsgate / Hillpoint Greens (ECF No. 25-7); see Defs.' Mem. ¶ 13 (ECF No. 25, at 3-4). The City's construction manager, Mr. Trimyer, however, took the position that it was difficult to discern whether problems arose during construction or were from normal wear and tear, but that the City "expect[ed] the improvements to be like new" when they accepted the subdivisions. Dep. Jason Trimyer 39:6-18 (ECF 20-5, at 11). For his work, F&D compensated Mr. Hall $7,930.72. Pl.'s Mem. ¶ 90 (ECF No. 20, at 12).

5

During this time, F&D advised Defendants of the claim and invited them to resolve it with the City to avoid liability under the indemnity agreement. See id. ¶ 80 (ECF No. 20, at 11). Defendants never posted any collateral pursuant to paragraph 13 of the Agreement, offered to defend the claims, or offered to provide the as-built drawings. Id. ¶¶ 82-85. Rather, on December 1, 2017, Defendant Kinser wrote that F&D "should defend against any claim made by the City of Suffolk after such unreasonable delay." Email re Third Request Claim (ECF No. 20-4, at 51). In response, F&D informed Defendant Kinser on December 4, 2017 that "it is up to Ramsgate to close out the matter." Id. (ECF No. 20-4, at 50). Defendants did not do so, but on April 25, 2018, Defendant Kinser informed F&D that the City's claims were time barred and that any payment would not be in good faith. Letter re Hillpoint Greens, Phases 1 and 2 (ECF 25-11).

In an April 24, 2018 letter responding to the City's claim, F&D advocated Ramsgate's defenses that the projects were completed in 2003 and that most of the claimed expenses were standard maintenance. See Letter re Principal: Ramsgate Construction (ECF No. 20-4, at 45). The City's May 4, 2018 response letter argued that the work was never completed and that under the relevant Virginia Code and Suffolk Ordinances a project is not complete until a certificate of final completion is provided or "the public facilities are accepted by the City." Letter re Hillpoint Greens Phase I and II (ECF No. 20-4, at 46). Mr. Hall, F&D's retained expert, also engaged in negotiations with the City, arguing that the claims on the project were too old and that may of the costs were simply maintenance. Dep. Jason Trimyer 39:6-11 (ECF 20-5, at 11); Pl.'s Mem. ¶¶ 65-67 (ECF No. 20, at 9-10). Eventually, the City made a final demand of $80,000, which F&D's consultant advised was a reasonable demand to settle the $426,179.41 bond claim. Decl. Susan Kerbel ¶ 18 (ECF 20-4, at 2); see Pl.'s Mem. ¶¶ 69-71 (ECF No. 20, at 10). F&D agreed to settle the claims against both bonds for a combined payment of $80,000. Pl.'s Mem. ¶ 77 (ECF No. 20,

at 11). Before completing the settlement, F&D contacted all indemnitors offering a final opportunity to resolve the issues before the settlement payment, which Defendants did not accept. Letter re Hillpoint Greens (also known as Hillpoint Meadows) Subdivision Bonds Sureties' Further Demand for Exoneration and Indemnity (ECF No. 20-4, at 53-54); see Pl.'s Mem. ¶ 87 (ECF No. 20, at 11). After settling, F&D requested reimbursement under the Indemnity Agreement, which Defendants declined. This claim followed.

## II. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 requires the Court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-24 (1986). "A material fact is one 'that might affect the outcome of the suit under the governing law.' A disputed fact presents a genuine issue 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Spriggs v. Diamond Auto Glass, 242 F.3d 179, 183 (4th Cir. 2001) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

The party seeking summary judgment has the initial burden of informing the Court of the basis of its motion and identifying materials in the record it believes demonstrates the absence of a genuine dispute of material fact. Fed. R. Civ. P. 56(c); Celotex Corp., 477 U.S. at 322-25. When the moving party has met its burden to show that the evidence is insufficient to support the nonmoving party's case, the burden shifts to the nonmoving party to present specific facts demonstrating that there is a genuine issue for trial. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). The "mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient." Anderson, 477 U.S. at 252. Rather, when "the

7

record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Ricci v. DeStefano, 557 U.S. 557, 586 (2009) (internal quotation marks omitted).

In considering a motion for summary judgment, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Prods.. Inc., 530 U.S. 133, 150 (2000); see Anderson, 477 U.S. at 255. "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249.

"When faced with cross-motions for summary judgment, the court must review each motion separately on its own merits 'to determine whether either of the parties deserves judgment as a matter of law.'" Rossignol v. Voorhaar, 316 F.3d 516, 523 (4th Cir. 2003) (quoting Philip Morris Inc. v. Harshbarger, 122 F.3d 58, 62 n.4 (1st Cir. 1997)). And in considering each individual motion, the court must again resolve factual disputes and rational inferences drawn therefrom in the light most favorable to the party opposing that motion. Id.

### III. DISCUSSION

From the parties' briefs and the hearing held on August 28, 2020, it is clear that there is no genuine dispute as to any fact material to the resolution of F&D's claims. As outlined below, and based on the record before the court, including the Indemnity Agreement, Plaintiff has shown that it did not breach the Indemnity Agreement because F&D was entitled to settle these disputed claims under the plain meaning of the Indemnity Agreement and did not act in bad faith in doing so. Defendants breached the Agreement by failing to indemnify F&D for the costs

8

incurred in settling these claims. Thus, Plaintiff is entitled to judgment as a matter of law for the settlement sum and reasonable attorneys' fees.

### A. The Plain Language of the Indemnity Agreement Requires That Defendants Indemnify Plaintiffs for the Costs of Settling the Claims by the City.

Unambiguous contract provisions are given their plain meaning. Bell BCI Co. v. Old Dominion Demolition Corp., 294 F. Supp. 2d 807, 812 (E.D. Va. 2003) (citing Pysell v. Keck, 559 S.E.2d 677, 678 (Va. 2002)). Thus, while "equity generally implies a right to indemnification in favor of a surety only when the surety pays off a debt for which his principal is liable . . . when there is such an express contract, a surety is entitled to stand upon the letter of his contract" rather than "resort[ing] to implied indemnity principles." Fidelity & Deposit Co. v. Bristol Steel & Iron Works, Inc., 722 F.2d 1160, 1163 (4th Cir. 1983) (internal quotation marks and citations omitted); see also Bell BCI Co., 294 F. Supp. 2d at 812 (citing id.); Fairfax Cty. Bd. of Supervisors v. Culbertson Constr. Co., 12 Va. Cir. 118, 119-24 (Va. Cir. Ct. 1987) (applying these general indemnity principles but holding that a surety could not profit at the expense of its indemnitor by exceeding the terms of the original contract).

The Agreement between F&D and Defendants Ramsgate, Folkes, and Kinser, contained an express indemnity clause in paragraph two, under which Defendants agreed to:

> "exonerate, indemnify, and keep indemnified the Surety from and against any and all liability for losses and/or expenses of whatsoever kind or nature (including, but not limited to, interests, court costs and counsel fees) and from and against any and all such losses and/or expenses which the Surety may sustain and incur: (1) By reason of having executed or procured the execution of the Bonds." Agreement (ECF No. 20-4, at 4).

The same paragraph further states:

> "[i]n the event of any payment by the Surety ... the Surety shall be entitled to charge for any and all disbursements made in good faith and about the matters herein contemplated by this Agreement under the belief that it is or was liable for the sums and amounts so disbursed, or that it was necessary or expedient to made such disbursements, whether or not such liability, necessity of expediency existed; and that the vouchers or other evidence

9

of any such payments made by the Surety shall be *prima facie* evidence of the fact and amount of the liability to the Surety." Id.

Thus, the unambiguous terms of paragraph two require Defendants to indemnify F&D for losses incurred as a result of issuing bonds for Ramsgate's construction of Hillpoint Sections 1 and 2, so long as F&D's disbursements were made in the "good faith" belief that it was either liable for the sums, or that it was "necessary or expedient" to pay such sums. See id.

Additionally, under paragraph thirteen of the Agreement, the parties further agreed that F&D had the "the right to adjust, settle or compromise any claim, demand, suit or judgment upon the Bonds *unless* the Contractor and the Indemnitors shall request the Surety to litigate such claim or demand, or to defend such suit, or to appeal from such judgment." Id. (ECF No. 20-4, at 6) (emphasis added). In order to litigate a suit, Defendants merely needed to make a request and "deposit with the Surety, at the time of such request, cash or collateral satisfactory to the Surety in kind and amount, to be used in paying any judgment or judgments rendered or that may be rendered, with interest, costs, expenses and attorneys' fees, including those of the Surety." Id. In other words, the Agreement expressly provided Defendants an opportunity to litigate the claims brought by the City provided they deposited collateral with F&D. Although Defendants urged F&D to contest the claims, they did not post any collateral or properly invoke their authority to require F&D to litigate them. Pl.'s Mem. ¶¶ 83-84 (ECF No. 20, at 11). Instead Defendant Kinser informed F&D that it was up to F&D to "defend against any claim made by the City of Suffolk." Email re Third Request Claim (ECF No. 20-4, at 51). Defendants now object that F&D's settlement was not made in good faith. Defs.' Cross Mot. Partial Summ. J. (ECF No. 24). But, under the plain language of the Agreement, F&D was entitled to settle the claims, provided F&D believed in "good faith" that it was either liable or that it was "necessary or expedient" to settle them. Agreement (ECF No. 20-4, at 4).

10

### B. An Indemnitor Is Liable for Its Obligations to a Surety That Has Paid a Bond Claim Unless the Surety Committed Fraud or Acted in Bad Faith.

Indemnity provisions are "common" and "uniformly sustained and upheld" with the exception of payments made ""through fraud or lack of good faith on the part of the surety." Fidelity & Deposit Co. v. Bristol Steel & Iron Works, Inc., 722 F.2d 1160, 1163 (4th Cir. 1983) (internal quotation marks and citations omitted). "[A]ny challenge to such payment must . . . rest[] solely on that claim of bad faith or fraud." Id. (citations omitted).

The parties have not directed me to any cases in which the Virginia Supreme Court has addressed bad faith in the context of a construction surety settling a bond claim. Rather, Virginia Supreme Court cases interpreting bad faith generally arise in the analogous setting of insurance law. Wolf v. Fauquier Cty. Bd. of Supervisors, 555 F.3d 311, 318 (4th Cir. 2009) (citing CUNA Mut. Ins. Soc'y v. Norman, 375 S.E.2d 724, 726-27 (Va. 1989); State Farm Mut. Auto. Ins. Co. v. Floyd, 366 S.E.2d 93, 96-97 (Va. 1988); Aetna Cas. & Sur. Co. v. Price, 146 S.E.2d 220, 228 (Va. 1966)). While the standard of bad faith may be different in the insurance context than in the context of a surety contract, the Virginia principals observed in these cases provide helpful guidance. See Fid. & Deposit Co. v. Wu, 552 A.2d 1196, 1199 (1988) (applying the rules governing insurance contracts to surety contracts).

A finding of bad faith requires more than mere negligence. See Aetna, 146 S.E.2d at 228. To determine if an insurer acted in bad faith regarding a settlement offer, the Virginia Supreme Court has considered factors such as whether the insurer had "both its own and the insured's interests in mind," whether the insurer made a "reasonably diligent effort . . . to ascertain the facts," and whether the insurer weighed the "probabilities in a fair manner." Id. (quoting Radio Taxi Service, Inc. v. Lincoln Mut. Ins. Co., 157 A.2d 319, 322, 323); see also CUNA Mut. Ins. Soc'y, 375 S.E.2d at 726-27 (listing factors for evaluating a bad-faith analysis including whether

reasonable minds could differ in interpreting policy provisions, whether the insurer reasonably investigated the claims, whether the evidence supported a denial of liability, whether the insurer used its refusal to pay as a tool in settlement negotiations, and whether the insurer's defense raises issues of first impression or debatable law). The requirement of something more than mere negligence is in line with the majority of courts which have addressed bad faith in surety contracts. These cases range from defining bad faith as unreasonable or negligent conduct to actual fraud, with many courts asking whether there was an improper motive or dishonest purpose. See PSE Consulting, Inc. v. Frank Mercede & Sons, Inc., 838 A.2d 135, 302-04, 302 n.12, 303 n.13 (Conn. 2004) (citations omitted) (listing cases); see also, Engbrock v. Fed. Ins. Co., 370 F.2d 784, 787 (5th Cir. 1967) ("[I]mproper motive . . . is an essential element of bad faith." (citations omitted)); Banque Nationale de Paris S.A. v. Ins. Co. of N. Am., 896 F. Supp. 163, 165 (S.D.N.Y. 1995) (analogizing to the business judgment rule to find that "[a]bsent self interest or fraud ... [a surety's] decision ought to be regarded as presumptively correct"); But see Rush Presbyterian St. Luke's Med. Ctr. v. Safeco Ins. Co., 712 F. Supp. 1344, 1346 (N.D. Ill. 1989) ("[N]egligence and bad faith are synonymous" in the context of indemnity agreements). While the parties in this case agree that a reasonableness standard does not apply, even if the Virginia courts were to embrace such a standard—as at least one trial court has[3]—the record does not show that F&D acted in bad faith under either an improper motive or reasonableness standard. See Pl.'s Opp. Mot. Summ. J. (ECF 27, at 4).

---

[3] See Transamerica Premier Ins. Co. v. Turf Specialists of Northern Virginia, Inc., 31 Va. Cir. 26, 29 (Va. Cir. Ct. 1993) ("The better reasoned approach, however, is to require the surety to put forth more than a minimal effort to ascertain the validity of a claim. The surety must reasonably investigate the claim. . . The surety cannot be allowed to blindly make payment to a claimant and expect to be indemnified.").

The undisputed facts in this case provide no evidence that F&D acted unreasonably or in bad faith in settling the City's claims. F&D clearly made a reasonably diligent effort to ascertain the facts of the case. The City's claims were supported by a report from the engineering firm of Clark and Nexsen. Pl.'s Mem. ¶ 32 (ECF No. 20, at 6). Additionally, F&D did not simply rely on the report provided by the City. Instead, F&D hired their own consultant, Darrell Hall, to investigate the City's estimates for repairs. Id. ¶ 35.

The record indicates that F&D not only investigated the City's claims but defended against them. F&D and its consultant advocated Ramsgate's defenses that the projects were completed long ago and that most of the claimed expenses were standard maintenance. See Letter re Principal: Ramsgate Construction (ECF No. 20-4, at 45). Not until after these negotiations did the City reduce its demand to $80,000. Pl.'s Mem. ¶ 70 (ECF No. 20, at 10). Before accepting this offer, F&D conferred with its consultant who advised that the settlement offer was reasonable. Decl. Susan Kerbel ¶ 18 (ECF 20-4, at 2); see Pl.'s Mem. ¶ 71 (ECF No. 20, at 10). Had F&D gone to trial, it would have incurred additional expenses to retain consultants and experts and conduct the litigation, which Defendants would also have been liable for under the terms of the Agreement. See Pl.'s Mem. ¶¶ 73-75 (ECF No. 20, at 10); Agreement (ECF No. 20-4, at 4). Instead, F&D settled for substantially less than the City had originally sought and obtained the release of both bonds from the City. Pl.'s Mem. ¶¶ 77, 79 (ECF No. 20, at 11). Thus, the undisputed record indicates that F&D did not simply make an unreasonable payment to the City expecting to be indemnified by Defendants.

Not only did F&D carefully weigh the impact of the settlement on Defendants, it also affirmatively encouraged Defendants to engage in the process of negotiating the claims with the City. In December 2017, F&D advised Defendants that it was their responsibility "to close out the

matter." Email re Third Request Claim (ECF No. 20-4, at 50). Plaintiff also offered Defendants a final opportunity to resolve the claims before accepting the settlement with the City. Letter re Hillpoint Greens (also known as Hillpoint Meadows) Subdivision Bonds Sureties' Further Demand for Exoneration and Indemnity (ECF No. 20-4, at 53-54); see Pl.'s Mem. ¶ 87 (ECF No. 20, at 11). In light of these facts, F&D appears to have fully considered the interests of their indemnitors in resolving the claims and provided them with multiple opportunities to assist in the process or assume financial responsibility by posting collateral. Defendants declined.

### C. Even If the Argument That the Claims Were Time-Barred May Have Been a Colorable Defense, Plaintiff Did Not Act in Bad Faith by Settling.

Defendants' opposition and Cross Motion for Partial Summary Judgment both argue that Plaintiff knew, or should have known, that the statute of limitations provided "an absolute bar to the City's claim." Defs.' Mem. Opp'n Pl.'s Mot. Partial Summ. J. (ECF No. 21, at 4) ("Defs.' Mem. Opp'n"); see also Defs.' Mem. (ECF No. 25, at 12). Because Plaintiff settled the City's claim notwithstanding the limitations defense, Defendants argue that Plaintiff acted in bad faith contrary to the Indemnification Agreement. Defs.' Mem. Opp'n (ECF No. 21, at 6-7). I disagree. While the statute of limitations may have provided a viable defense, Plaintiff did not act in bad faith in choosing to settle the City's claims.

Although this issue has not been specifically addressed by Virginia courts, other courts have found that settling a claim despite a possible defense is not sufficient to establish a surety's bad faith. See, e.g., Arch Ins. Co. v. Centerplan Constr. Co., LLC, 368 F. Supp. 3d 350, 372 (D. Conn. 2019) ("[C]ourts have held that a surety is not acting in bad faith by settling a claim even where the principal objected and raised colorable defenses." (citing Transamerica Ins. Co. v. Avenell, 66 F.3d 715, 718, 721 (5th Cir. 1995); Ins. Co. of Am. v. Merritt-Meridian Constr. Corp.,

14

975 F. Supp. 511, 518 (S.D.N.Y. 1997))); Palestine Water Well Serv. v. Wash. Int'l Ins. Co., Civil Action No. DR:15- CV-016-AM-CW, 2015 U.S. Dist. LEXIS 193956, at *27 (W.D. Tex. Sep. 30, 2015) ("A surety does not act in bad faith by settling claims instead of pursuing possible defenses open to its principal" (citing Avenell, 66 F.3d at 718, 721)); Gen. Accident Ins. Co. of Am. v. Merritt-Meridian Constr. Corp., 975 F. Supp. 511, 518 (S.D.N.Y. 1997) ("A decision to proceed with claims despite possible defenses . . . is not evidence of bad faith."); PSE Consulting, Inc. v. Frank Mercede & Sons, Inc., 838 A.2d 135, 313 n.15 (Conn. 2004) ("We recognize the authority holding that a surety is not acting in bad faith in seeking indemnification from a principal simply because the principal objected to and raised colorable defenses to payments made by the surety to the claimant." (citations omitted)).

Defendants assert that a statute of limitations defense is distinguishable from other defenses, as it is "an absolute bar." Defs.' Opp'n (ECF No. 21, at 4). However, a statute of limitations defense is not a guaranteed defense. Rather, a statute of limitations defense raises two questions: (1) the length of the statute of limitations and (2) when this statute of limitations period accrued, both of which are disputed by the parties. The parties variously assert that the statute of limitations may be five or ten years. See Defs.' Opp'n (ECF No. 21) (citing Va. Code Ann. § 2.2-4340 ("No action against the surety on a performance bond shall be brought unless within five years after completion of the contract."); Va. Code Ann. § 8.01-246 ("In actions on any contract that is not otherwise specified and that is in writing and signed by the party to be charged thereby, or by his agent, within five years whether such writing be under seal or not.")); Pl.'s Mem. (ECF No. 20, 16-17) (citing Va. Code Ann. § 8.01-245(a) ("No action shall be brought upon the bond of any fiduciary except within ten years next after the right to bring such action shall have first

15

accrued.")).[4] Additionally, the parties dispute whether the cause of action accrues when the primary obligor defaults on the bonds or when demand for payment is made on the bonds. See Defs.' Opp'n (ECF No. 21); Pl.'s Mem. (ECF No. 20, 17-18). As the bonds had not been released, the 2017 claim by the City would trigger the statute if demand is required, but even assuming the cause of action on the bonds accrued upon default of the primary obligor, it is not clear from the record when this would have occurred. Defendants assert that the statute of limitations is five years and that the latest the statute of limitations could have begun to accrue was March 7, 2008 when Defendants received the Punch List, which listed work they failed to perform. Defs.' Mem. ¶ 8 (ECF No. 25, at 3). Yet the evidence reveals that as late as 2014, Brad Fussell of Precon Construction continued to discuss working on the items listed, and the City had still not yet released the bonds. See Email re Hillpoint Meadows – Ramsgate Corp. (ECF No. 20-6); Pl.'s Mem. ¶¶ 21, 26 (ECF No. 20, at 5). Both the 2017 date of demand and the 2014 date of continued negotiation fall within five years of F&D's settlement. Thus, while a statute of limitations defense may have been a strong defense, it was no guarantee of success against the City's claim. As a result, F&D did not act in bad faith by asserting the defense and eventually settling the claim for approximately 20% of the sums sought by the City.

In sum, Defendants' argument cannot establish that Plaintiff acted in bad faith in settling the City's claims. A reading of the Indemnity Agreement and the undisputed record before the Court, establishes that the parties agreed F&D was entitled to settle claims and that if the

---

[4] While the statute of limitations for the City's claim is likely five years based on Virginia Code Sections 2.2-4340 and 8.01-246, it is not necessary to address this question to resolve the pending motions. Because of ambiguities regarding the commencement of the limitations period, the statute of limitations defense was not a guaranteed bar to recovery as Defendants claim.

Indemnitors wished to insist on controlling the defense they could do so provided they posted collateral with the surety. Defendants chose not to, and Plaintiff exercised its power under the Indemnity Agreement to settle the City's claims. There is no indication that this settlement was in bad faith.

## IV. CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Partial Summary Judgment (ECF No. 19) is GRANTED and Defendants' Cross Motion for Partial Summary Judgment (ECF No. 24) is DENIED. The clerk is DIRECTED to enter judgment in favor of Plaintiff in the amount of $87,930.72. Pursuant to 54(d)(2) of the Federal Rules of Civil Procedure, Plaintiff may file a motion for reasonable attorney's fees within 14 days of entry of judgment. See Fed. R. Civ. P. 54(d)(2)(B)(i).

IT IS SO ORDERED.

/s/
Douglas E. Miller
United States Magistrate Judge

DOUGLAS E. MILLER
UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia
September 18, 2020